# BALTIMORE AND OHIO RAILROAD COMPANY

*vs.*

## JONES & LAUGHLIN STEEL COMPANY, TO THE USE OF THE CROWN CORK COMPANY, LIMITED.

*Bill of Lading—Notice of Arrival—To Whom to be Given—
Evidence of Agency—Custom.*

Where a bill of lading issued by a railroad company provided that the liability for damage by fire occurring forty-eight hours after notice of the arrival of the property at destination or at port of export should be that of warehouseman only, and that property not removed by "the party entitled to receive" it within forty-eight hours after notice of its arrival, might be stored by the carrier "subject to carrier's responsibility as warehouseman," *held* that the notice necessary to reduce the carrier's liability from that of insurer to that of warehouseman had to be given to "the party entitled to receive" the goods.

p. 608

The "party entitled to receive" the goods, within the meaning of the bill of lading, was the purchaser of the goods, who had an interest in them, and not a steamship company, accepting them at the port of export where the contract of carriage ended, for conveyance to their destination. ⏐ pp. 608, 612

Evidence that the shipment in question was one of a series of similar shipments over defendant's railroad, as a result of orders from one purchaser for the purpose of export, the bills of lading all being sent by the shipper to that purchaser, who in turn sent them to a certain steamship company, which directed the railroad company as to the time and manner of bringing the goods alongside the vessel on which they were to be loaded at the port to which they were shipped by the seller, *held* to call for the submission to the jury of the question whether the steamship company was the agent of "the party entitled to receive" the goods, so as to be a proper recipient of the notice of their arrival. p. 611

An agency may be implied from conduct, and need not be proved by evidence of an express appointment.          p. 611

An issue of fact, as to the existence of an agency implied from conduct, must be submitted to the jury, if any evidence legally tending to prove the agency has been offered.          p. 611

That the verdict is to be rendered by the court sitting as a jury does not impair the right of either party to a correct statement of the principles by which the decision of the issues of fact should be controlled.          p. 611

It appearing that defendant railroad company followed the customary course of dealing, in holding the goods at its terminal while awaiting notice as to when and where a steamer would be available, and that it was optional with the steamship company to substitute another vessel for that primarily designated, it was error to grant prayers involving the propositions that defendant's liability as carrier could not be terminated, under the terms of the bill of lading and plaintiff purchaser's directions, until the delivery of the goods at the steamship company's pier, and that it was defendant's duty, on that company's refusal to receive the goods on the vessel first designated, to give notice of such refusal to the shipper or consignee.

pp. 611, 612

A custom at a terminal of defendant's railroad, in reference to the sending of notice of the arrival there of goods intended for export, not being sufficiently general to impute knowledge of its existence to those for whom the contract of carriage was undertaken by defendant, evidence thereof was not admissible to modify the terms of the contract of carriage, especially in view of the effect of Federal legislation applying to the shipment as interstate commerce.          p. 614

*Decided June 27th, 1921.*

Appeal from the Superior Court of Baltimore City (DUFFY, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Duncan K. Brent* and *W. Calvin Chesnut,* with whom was *Allen S. Bowie* on the brief, for the appellant.

*Arthur W. Machen, Jr.,* and *Raymond S. Williams,* with whom were *Hershey, Machen, Donaldson & Williams* on the brief, for the appellee.

URNER, J., delivered the opinion of the court.

A carload of tin plate was destroyed by fire on a pier of the Baltimore and Ohio Railroad Company while awaiting transfer at Locust Point, Maryland, to a vessel of the Garland Steamship Line. The railroad company is charged with liability in this suit on the theory that its relation to the shipment was still that of carrier at the time of the fire. If that relation had ceased to exist and the railroad company was merely in the position of a warehouseman of the property when the fire occurred, it is not chargeable with any liability on account of the loss, which is conceded to have happened without any negligence on its part.

The shipment originated at Woodlawn, Pennsylvania. It consisted of three hundred and eighty boxes of tin plate contained in car No. 33767 of the Pittsburgh and Lake Erie Railroad Company. It was consigned by Jones & Laughlin Steel Company to the Crown Cork Company, Limited, and was accepted for transportation over the Pittsburgh and Lake Erie and the Baltimore and Ohio lines to Locust Point for export to London. The tin plate was received at Woodlawn by the initial carrier on October 9th, 1917, and arrived at Locust Point on the morning of October 22nd. The freight was prepaid "to steamer" and included lighterage. Upon the bill of lading were noted the numbers of the Government license and Baltimore and Ohio Railroad Company permit authorizing the shipment and necessary to be obtained under the war regulations then in force. The permit referred to was issued at the request of the Crown Cork and Seal Company of Baltimore, which was the real purchaser of the tin plate mentioned in the bill of lading. It was stated in the

permit that the material was intended for delivery to the Garland Steamship Company. On October 12th the Crown Cork and Seal Company, of which the Crown Cork Company, the consignee of the tin plate, is a foreign subsidiary, notified the Baltimore and Ohio Railroad Company that the steamship "Alamance" of the Garland Line was the vessel to which the carload of tin plate was to be delivered. The car reached Locust Point in ample time for the transfer of the tin plate to the designated steamer, which sailed on October 29th, but for lack of available cargo space on that vessel the steamship "Norlina," of the same line, scheduled to sail three days later, was substituted. Before the shipment could be transferred to the "Norlina" it was destroyed by the fire already mentioned, which occurred on October 29th. The tin plate was then on the Baltimore and Ohio pier, where it had been unloaded while directions for its delivery to the steamer were being awaited. On the day after the shipment was received at Locust Point the railroad company notified the steamship company of its arrival, and of the fact that it was intended to be forwarded over the latter company's line. The railroad company did not inform the shipper or the consignee that the goods had reached its terminal. Because of this omission it is claimed that the railroad company's liability as carrier had not ended but was subsisting when the property was destroyed.

The bill of lading, which was non-negotiable in form, stipulated as follows: "For loss, damage or delay caused by fire occurring 48 hours (exclusive of legal holidays) after notice of the arrival of the property at destination or at port of export (if intended for export) has been duly sent or given, the carrier's liability shall be that of warehouseman only." "Property not removed by the party entitled to receive it within 48 hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot or place of delivery of carrier or warehouse, subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only, or may be at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the

owner and there held at the owner's risk and without liability
on the part of the carrier, subject to a lien for all freight and
other lawful charges, including a reasonable charge for stor-
age." At common law the notice necessary to terminate the
carrier's liability as insurer, and replace it with the less bur-
densome liability of a warehouseman, was required to be given
to the shipper or consignee. But under the provisions quoted
from the bill of lading in this case the notice designed to have
such an effect had to be given to "the party entitled to re-
ceive" the goods to which that instrument refers. This is the
evident meaning of the stipulation that property not removed
within the specified time, by the party entitled to receive it,
should be subject only to the carrier's responsibility as ware-
houseman.

The Crown Cork and Seal Company was entitled to receive
the tin plate and to direct its movement from the railroad
terminal to which it had been brought for export. That cor-
poration had bought the material on its own account, as ap-
pears from the correspondence in the record. It was evidently
exercising the rights of ownership when it designated the
steamship line and the particular vessel by which the goods
were to be transported to its subsidiary company in England.
For all the purposes of the present inquiry the consignee was
the Crown Cork and Seal Company. So far as the railroad
company's contract of carriage was concerned the destination
was Locust Point, but it further undertook, for the amount
of the prepaid freight, to convey the goods to the steamer
selected for their sea transportation. When the goods arrived
at the point where they were in a position to be transferred
to the steamer, as soon as it was ready for their reception, the
defendant, by giving notice of their arrival to "the party
entitled to receive" the shipment, or its authorized agent,
could secure the early termination of the insurer's liability
incident to a common carrier's undertaking, and assume the
more limited responsibility to which a warehouseman is sub-
ject. The only notice actually given was that communicated
to the Garland Steamship Company, and unless it had author-

ity to act as the agent of the Crown Cork and Seal Company
in the control and disposition, at that time and place, of the
goods subsequently destroyed by fire, the railroad company
should be held liable for the loss, for it would not then be
in the position of having complied with the condition in the
bill of lading upon which its relief from such a liability de-
pends. If, however, the steamship company was invested
with the authority of such an agency as we have just de-
scribed, the railroad company ought not to be amenable to
this suit, as the loss for which it is brought occurred more
than the prescribed period of forty-eight hours after the notice
to the steamship company was delivered.

At the trial below, before the court sitting as a jury, in-
structions were granted, at the request of the plaintiff, that
if the defendant railroad company accepted the carload of tin
plate for conveyance to Locust Point and delivery to the Gar-
land Steamship Company for transportation to England, and
that the defendant did not so deliver, but unloaded the goods
on its pier, where they were destroyed by fire, and that the
plaintiff made claim on account of the loss within six months,
as required by the bill of lading, as to which there was no
dispute, then the plaintiff was entitled to recover the value
of the goods at the time and place of shipment, with interest
in the discretion of the court, even though the defendant on
October 23rd, 1917, notified the Garland Steamship Company
of the arrival of the goods at Locust Point. In connection
with this instruction another was granted, at the plaintiff's
instance, to the effect that if the Crown Cork Company, Ltd.,
directed the defendant to deliver the carload of tin plate to
the steamer Alamance of the Garland Steamship Company,
and that company refused to receive the goods on the vessel
so designated, then the defendant was bound to give prompt
notice of such refusal to the shipper or consignee, and if the
court, sitting as a jury, found that such notice was practicable
but was not given, then the plaintiff was entitled to recover.

By the instructions just summarized the theory that the notice given the steamship company might have been effective, after the lapse of forty-eight hours, to reduce the defendant's liability to that of warehouseman, is wholly disregarded. It was assumed that there was no evidence legally sufficient to prove that the steamship company was the consignee's duly authorized agent. The omission of the defendant to notify the shipper or the consignee itself was treated as being fatal to the claim that the carrier's liability had ended. On the other hand, the defendant's prayers, which the trial court rejected, were founded in part on the assumption that the evidence conclusively proved the steamship company to be the proper recipient of the notice which was designed by the bill of lading to have the effect of terminating the defendant's responsibility as carrier after the expiration of the stated period. The verdict and judgment were in favor of the plaintiff for the sum of $9,756.62, being the value of the tin plate with interest.

The carload of material with which we are concerned in this case was one of a series of similar shipments over the same transportation lines during the period from August to December, 1917. The orders relating to the purchase and conveyance of the tin plate were all given by the Crown Cork and Seal Company of Baltimore. The bills of lading were all sent by the shipper to that company, which forwarded them to the Garland Steamship Company to enable it to obtain the goods from the railroad carrier. Cargo sheets were then prepared by the steamship company and sent by it with the bills of lading to the railroad company, which was at the same time given written direction by the steamship company, as to when the goods should be placed alongside of the vessel on which they were to be loaded. After the arrival of the tin plate at Locust Point it was wholly subject to the orders of the steamship company as to its further movement. In the case of the carload destroyed by fire, specific directions had been given the defendant by the Crown Cork and Seal Company, while the car was in transit, to deliver it to the steam-

ship company. The proof as to the course of dealing we have indicated tends to show the existence of an agency in the Garland Steamship Company to act for the owner in regard to the receipt from the railroad company of the property which is the subject of this suit. While the evidence may not conclusively prove the agency, yet it admits of a rational inference of that relation. The possession of the bills of lading by the steamship company, the previous direction for the delivery of the goods to it on their arrival at Locust Point, and the complete control which it was allowed to exercise over the goods after they reached the railroad terminal, are circumstances which support the theory that authority was intended to be conferred upon the steamship company to act as the agent of "the party entitled to receive the goods" from the defendant. An agency may be implied from conduct and need not be proven by evidence of an express appointment. *Heise & Bruns* v. *Goldman,* 125 Md. 559; *Rosenstock* v. *Tormey,* 32 Md. 169. In our view of the evidence in this case it was legally sufficient to require the submission of the question of agency to the jury. It is not for the court to decide whether or not the agency existed. Such an issue of fact must be submitted to the jury if any evidence legally tending to prove the agency has been offered. *Nat. Mech. Bank* v. *Nat. Bank of Balto.,* 36 Md. 21; *Heise & Bruns* v. *Goldman, supra.*

The two prayers granted at the plaintiff's request entirely left out of consideration the theory of agency which the evidence tended to support. Because of that omission the instructions did not properly and completely define the issues to be decided. The fact that the verdict was to be rendered by the court, sitting as a jury, did not impair the right of either party to a correct statement of the principles by which the decision of the issues of fact should be controlled. *Alexander* v. *Capital Paint Co.,* 136 Md. 658; *Mass. Bonding Co.* v. *Casualty Ins. Co.,* 129 Md. 194; *McCullough* v. *Biedler,* 66 Md. 284.

The first of the plaintiff's granted prayers included the proposition that the defendant's liability as carrier could not

be terminated, under the terms of the bill of lading and the plaintiff's directions, until the delivery of the tin plate at the Garland Steamship Company's pier, while the other granted prayer was based upon the theory that the steamship company refused to receive the goods on the steamer "Alamance," and that it was the duty of the defendant to give notice to the shipper or consignee of such refusal. It was proven that the defendant followed the customary course of dealing, with respect to this series of shipments, in holding the carload in question at its terminal while awaiting notice as to where and when a steamer would be available, and it appears also that it was optional with the steamship company to substitute another vessel for the one primarily designated, if the necessary cargo space could not otherwise be afforded. The prayers were not properly adapted to this state of proof, and for that reason, as well as for their disregard of the question of agency to which we have referred, there was error in the granting of these instructions.

Two of the four prayers offered by the defendant in effect asked the court to treat the notice to the steamship company as sufficient to relieve the defendant of its carrier liability at the expiration of forty-eight hours after the notice was given. This ruling was asked on the theory that the agency of the steamship company had been conclusively proven, and that, independently of the question of agency, the steamship company was the "party entitled to receive the goods" within the intent and meaning of the bill of lading for the purposes of the notice for which it made provision. It does not seem to us that either of these contentions is entitled to be sustained. The evidence permits, but does not absolutely require, the inference as to the existence of the agency upon which the defendant relies. It was not an expressly created agency. It could only be found to exist by implication from all the circumstances. The question was one of fact, and not of law, under the conditions here presented. Apart from the theory of agency, we find no sufficient basis for the view that the steamship company was "the party entitled to receive" the

B. & O. R. CO. vs. STEEL CO.          613

Md.]                    Opinion of the Court.

goods within the purview of the bill of lading, and that the notice given to it was, therefore, sufficient to modify the defendant's responsibility.  According to our construction of the bill of lading the *"party entitled to receive"* the goods has an interest in them distinct from that of a carrier accepting them for conveyance to their destination.  At Locust Point, where the performance of the defendant's contract of carriage ended, and where the bill of lading which evidenced that contract was surrendered into its possession, the right to control the movement or demand the delivery of the shipment was in the Crown Cork and Seal Company, which had purchased the goods and directed their transportation to the point from which they were to be exported.  A notice to the ocean carrier alone, unless it could be regarded as the agent of the consignee or shipper, would not have served at common law to change the railroad company's original liability (*Texas & Pac. Ry. Co.* v. *Callender,* 183 U. S. 632; *United Fruit Co.* v. *Transportation Co.,* 104 Md. 567), and the bill of lading should not be construed as reducing the obligation of the issuing carrier further than its language clearly intends.  The provision that the notice shall be given to "the party entitled to receive" the goods is certainly not a clear and definite indication of a purpose that it may be effectively given to a connecting transportation company regardless of the fact or extent of its authority to act for the owner in the transaction, and we would not feel justified in adopting that interpretation.  The two prayers of the defendant to which we have referred were, therefore, properly refused.

One of the prayers offered by the defendant was open to the objection that it submitted an issue of law as the basis of the verdict, and by the remaining prayer the agency of the steamship company for the owner of the goods in transit was assumed.  There was no error in the rejection of these prayers.

In disposing of the questions involved in the exception to the action of the court below on the prayers, we have sought to give proper effect to the particular terms of the bill of lad-

ing by which the rights and liabilities of the parties are prescribed, and we have not found it desirable to extend our discussion to some of the general considerations suggested in argument, or to prolong the opinion by distinguishing cited cases which we have not found to be analogous to the one we are now deciding.

The only other exceptions in the record were taken to the refusal of the trial court to allow the defendant railroad company to prove the custom at its Locust Point terminal in reference to notices of the arrival there of goods intended for export. The witness who was being interrogated on this point had stated that he could not testify as to the custom in regard to such notices at the other Baltimore terminals, but only as to the customary practice at the defendant's terminal at Locust Point. It was the evident purpose of the inquiry to prove a custom to send the notices only to the ocean carrier lines to which the goods for export were to be transferred. This was shown by other testimony to have been the course habitually pursued with respect to the series of shipments in which the one now under consideration was included. But the proffered evidence as to the defendant's practice in giving notice of the arrival of goods for other consignees was subject to the criticism that it was not sufficiently general to impute knowledge of its existence to those for whom this contract of carriage was undertaken, and it could not be admitted to modify the terms of the contract, especially in view of the effect of the Federal legislation applying to the shipment as interstate commerce. 17 *C. J.* 455; 27 *R. C. L.* 161; *Duling* v. *Phila., W. & B. R. R., Co.,* 66 Md. 123; *Agric. Mfg. Co.* v. *Atlantic Fert. Co.,* 129 Md. 42; *Southern Ry. Co.* v. *Prescott,* 240 U. S. 632.

*Judgment reversed with costs and new trial*
*awarded.*